UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| UNITED STATES OF AMERICA, | ) | | |
|---|---|---|---|
| *Plaintiff,* | ) | | |
| vs. | ) | | |
| HASSAN RAFLE, | ) | Cause No. | 1:11-cr-15-WTL-KPF-7 |
| JAMA MIRE, *and* | ) | | 1:11-cr-15-WTL-KPF-8 |
| LIBAN ABDIRAHMAN, | ) | | 1:11-cr-17-WTL-KPF-5 |
| *Defendants.* | ) | | |

## ENTRY ON DEFENDANTS' RULE 29(a) MOTIONS

The cause is before the Court on the Defendants' Rule 29(a) Motion for Judgment of Acquittal. The Court, being duly advised, **DENIES** the motion in its entirety.

## I. LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure provides that, "after the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant challenging the sufficiency of the evidence faces a difficult task. *See United States v. Gallardo*, 497 F.3d 727, 737 (7th Cir. 2007). In ruling on a Rule 29 motion, the Court must view the evidence in the light most favorable to the Government, keeping in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences. *See United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989). A judgment of acquittal may be entered "only if, viewing the evidence in the light most favorable to the prosecution, the record contains no evidence on which a

rational jury could have returned a guilty verdict." *United States v. Murphy*, 406 F.3d 857, 861 (7th Cir. 2005); *see also United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003) (noting similar standard under Rule 29(c) where jury verdict is challenged). If a court reserves ruling on a motion made during trial, it must decide the motion based on the evidence at the time the ruling was reserved. Fed. R. Crim. P. 29(b).

## II.  BACKGROUND

Defendant Hassan Rafle was charged by grand jury indictment with violating 21 U.S.C. § 841(a)(1) by knowingly conspiring to possess with intent to distribute and to distribute cathinone, a Schedule I Narcotic Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). Rafle was arrested on February 18, 2011.

Defendant Jama Mire was charged by grand jury indictment with one count of violating 21 U.S.C. § 841(a)(1) by knowingly conspiring to possess with intent to distribute and to distribute cathinone, a Schedule I Narcotic Controlled Substance, in violation of 21 U.S.C. § 841(a)(1), one count of knowingly possessing with intent to distribute cathinone, in violation 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), and one count of knowingly using or maintaining a place for the purpose of distributing and using any controlled substance, namely cathinone, in violation 21 U.S.C. § 856(a)(1) and 856(b) and 18 U.S.C. § 2. Mire was arrested on February 17, 2011.

Defendant Liban Abdirahman was charged by grand jury indictment with violating 21 U.S.C. § 841(a)(1) by knowingly conspiring to possess with intent to distribute and to distribute cathinone, a Schedule I Narcotic Controlled Substance in violation of 21 U.S.C. § 841(a)(1). Abdirahman was arrested on February 17, 2011.

A bench trial was held on these matters from March 26, 2012, through March 30, 2012. At the close of the Government's case, the Defendants moved for judgments of acquittal

pursuant to Federal Rule of Criminal Procedure Rule 29(a). The Defendants' arguments and the Court's decision follows.

### III. **DISCUSSION**[1]

#### A. Due Process

Mire, Rafle, and Abdirahman argue that the Controlled Substances Act violates the Due Process Clause as applied to them because it fails to provide adequate notice that khat containing cathinone is a controlled substance. While this argument is an issue of first impression in the Seventh Circuit, every circuit to face the issue has held that the CSA as applied to khat cases does not run afoul of the Due Process Clause. *United States v. Hassan*, 578 F.3d 108, 122 (2nd Cir. 2009); *United States v. Caseer*, 399 F.3d 828, 839 (6th Cir. 2005); *United States v. Sheikh*, 367 F.3d 756, 764 (8th Cir. 2004); *United States v. Hussein*, 351 F.3d 9, 15 (1st Cir. 2003). The reasoning of these circuits is persuasive, and the Court finds that the statute is constitutional as applied to the Defendants.

The Defendants invoke the void-for-vagueness doctrine, which "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). When there is no First Amendment right at issue, the Court evaluates a void-for-vagueness challenge to a statute as applied to the facts of the case at hand on an as-applied basis. *E.g.*, *United States v. Collins*,

---

[1] The Defendants have adopted portions of other Defendants' arguments. While the Court will address each Defendant's argument within the applicable section, the Court provides the following summary of arguments: Mire offered argument as to sections A through D above, and Rafle and Abdirahman joined in these arguments as to sections A through C. Rafle offered argument as to section E, on which Abdirahman offered additional argument. Abdirahman made the arguments discussed in sections F and G.

272 F.3d 984, 989 (7th Cir. 2001).

As a preliminary matter, the Court notes that the fair warning issue with the cathinone regulatory scheme in the CSA is not so much a vagueness problem as it is an obscurity problem. *See Caseer*, 399 F.3d at 836. The CSA clearly and specifically lists cathinone as a controlled substance – indeed it is hard to imagine how it could more clearly regulate a substance than by listing its scientific names, which, unlike street names, are not easily subject to mutation. But in doing so, it relies exclusively on technical or scientific terms foreign to ordinary persons and confusing even to forensic chemists. *E.g.*, Trial Tr. of Testimony of Marc LeBeau, 14:14-20, March 26, 2012, ECF No. 430 (erroneous testimony of FBI forensic scientist with eighteen years experience that khat is listed in Schedule I, but that he is uncertain whether cathinone is listed); *Hassan*, 578 F.3d at 121-22. Thus, while the CSA listing at issue here is not "vague" in the traditional sense, it poses the same constitutional problem: "the term 'cathinone' is sufficiently obscure that persons of ordinary intelligence reading the controlled substances schedules probably would not discern that possession of khat containing cathinone and/or cathine constitutes possession of a controlled substance." *Id.*

However, "one important aspect in evaluating [vague statutes] is whether the challenged statute contains a *scienter* requirement." *United States v. Cherry*, 938 F.2d 748, 754 (7th Cir. 1991). The requirement that the government prove intent or knowledge goes far in addressing the argument that application of the statute is so unfair as to be held invalid. *Id; see United States v. Hussein*, 351 F.3d 9, 14 (1st Cir. 2003) (noting that the defendant faces an "uphill climb" when the offense includes a scienter requirement). The crimes with which Mire is charged each require proof of knowledge or intent to secure a conviction. While the statute's construction does raise constitutional concerns, the Court finds that the scienter element adequately addresses the

concern that potential khat-users may lack fair warning as to what conduct is prohibited. *Accord Hassan*, 578 F.3d at 122; *Caseer*, 399 F.3d at 839; *Sheikh*, 367 F.3d at 764; *Hussein*, 351 F.3d at 15.

Mire urges the Court to adopt Judge Holschuh's dissenting opinion in *Caseer* that the infirmity in the CSA is not adequately addressed by the requirement of scienter. *Caseer*, 399 F.3d at 846. According to Judge Holschuh, a person of ordinary intelligence could reasonably conclude that possession of khat is clearly *not* illegal because, unlike other plants containing controlled substances, it is not listed. *Id.* at 847. However, the Court evaluates the statute with an eye toward the facts of the case at bar, *Collins*, 272 F.3d at 989, and there has been no testimony suggesting that Mire falls into the category of persons who consulted the CSA and concluded that khat was not illegal. Furthermore, "the more important aspect of vagueness doctrine 'is not actual notice,' but the other principal element of the doctrine–the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, 461 U.S. at 358 (citing *Smith v. Goguen*, 415 U.S. 566, 573-74 (1974)); *see also United States v. Jackson*, 935 F.2d 832, 838 (7th Cir. 1991). The Defendants have not suggested that the CSA cathinone-cathine regulatory scheme fails to provide adequate guidelines to guide law enforcement in arbitrary and capricious decisionmaking. Thus, the Court does not reach this issue. The Court is confident that, in this case, "the concern that a person of ordinary intelligence could unwittingly expose himself or herself to criminal penalties due to the vagueness [or obscurity] of the controlled substances schedules with respect to khat is overcome . . . because . . . conviction requires a showing of actual knowledge that khat contains a controlled substance." *Caseer*, 399 F.3d at 839.

## B. Evidence of State of Mind

Assuming for the sake of argument that the CSA passes constitutional muster, the Defendants argue that the evidence, even when taken in the light most favorable to the Government, fails to establish the requisite state of mind beyond a reasonable doubt. The Court disagrees.

With respect to the conspiracy charge, conspiracy is a specific intent crime and the government must prove that the defendant conspired to distribute, with intent to distribute, a controlled substance. *United States v. Maholias*, 985 F.2d 869 (7th Cir. 1993). When direct evidence is absent, "circumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime." *Hassan*, 578 F.3d at 123. Each defendant is charged with conspiring to possess with intent to distribute and to distribute cathinone in violation of 21 U.S.C. § 841(a)(1). Section 841 provides that "it shall be unlawful for any person to knowingly or intentionally . . . distribute . . . or possess with intent to distribute . . . a controlled substance." Therefore, the government must show that the defendant knew that khat contained a controlled substance. *Id.*

The Government's evidence, taken in the light most favorable to it, is sufficient to support a finding that Hassan Rafle knew that khat contained a controlled substance. Wiretapped telephone conversations reveal that Rafle was driving khat to Indianapolis on October 30, 2010. During a phone call at 1:26 a.m. that day, Hussein Ahmed asked where Rafle was, and Rafle replied that he was just crossing Interstates 465 and 70. Ahmed advised Rafle to get off on the Michigan exit and "change to local roads." During another call ten minutes later, Ahmed suggested that Rafle meet him at a restaurant called the Rathskeller because it did not have much traffic. Rafle explained that he had already driven past the Rathskeller and suggested that the two

meet at the Greyhound bus station. While Ahmed was reluctant because "there could be people at the Greyhound station," he agreed to meet Rafle there. This secretive behavior is sufficient to impute knowledge to Rafle that the khat he was carrying contained a controlled substance.

The Government's evidence is also sufficient to support a finding that Jama Mire knew that khat contained a controlled substance. Agent Jeremy Michaelis testified regarding Mire's statements during the interview following Mire's arrest on February 17, 2011. During this interview, Agent Michaelis asked Mire about the bags of dried khat that were seized from the Somali House of Coffee. Mire told the agent that the dried khat did not belong to him and that it may have been placed there by his enemies. Mire also stated that he had never seen khat in Indianapolis. Mire's deceptive statements to Agent Michaelis are sufficient to show criminal knowledge about the khat that was seized from the Somali House of Coffee.

Likewise, the evidence adduced at trial is sufficient to support a finding that Liban Abdirahman knew that khat contained a controlled substance. On November 8, 2010, Abdirahman received a call from Yusuf Mohamed. Yusuf Mohamed was upset and nervous because he had been pulled over by police, and the khat he had been transporting had been seized. Mohamed explained that one of the boxes that he had been transporting was for a "guy" for whom Abdirahman had previously delivered khat, and the other box was for Abdirahman himself. When Mohamed became increasingly upset about the seizure, Abdirahman repeatedly told Mohamed to "be thankful to God" that the police let him go. This statement is sufficient evidence to show that Abdirahman knew that khat contained a controlled substance.

### C. Evidence of Agreement

The Defendants also argue in the alternative that the evidence, even when taken in the light most favorable to the Government, fails to establish an agreement with other persons to

violate 21 U.S.C. § 841(a)(1) beyond a reasonable doubt. Again, the Court disagrees.

As to Defendant Hassan Rafle, the Court heard testimony that Rafle transported dry khat for Hussein Ahmed from Columbus, Ohio, to Indianapolis, Indiana, until roughly the end of 2010. Rafle, who knew that he was transporting khat, was paid roughly $400 per trip to transport it. While in Columbus, Rafle also purchased khat on Ahmed's behalf. One particular phone call clearly lays out their relationship: on October 29, 2010 at 6:51 p.m., Rafle relates that he is just entering the State of Ohio and 20 miles away from Dayton. Rafle states to Ahmed that he (Rafle) will call Ahmed once he gets into the city. Later that evening at 9:22 p.m., Ahmed called Rafle, who was in Columbus, to discuss the sale in progress. Rafle reported that the seller could only provide him with half of the original amount that Ahmed had anticipated. Nevertheless, Rafle and Ahmed decided to purchase this lesser amount of khat because there was no khat in Indianapolis to be had. Ahmed then suggested that he and Rafle sell the khat, explaining to Rafle that it would turn a good profit, and Rafle agreed. Lines 53 through 69 of the telephone transcript are particularly telling and clearly evidence a conspiratorial agreement.

As to Defendant Jama Mire, Hussein Ahmed stated that he (Ahmed) began selling fresh khat at the Somali House of Coffee in April 2009. Mire was the sole proprietor of the Somali House of Coffee at this time. In June 2009, Ahmed also began to sell dry khat there, which he testified was also called "G-20." He explained that, before he began selling there, he and Mire had a discussion about selling khat at the shop. The two opined that selling khat at the shop would bring in more customers, which, according to Ahmed, did in fact occur. Hashim Ahmed also testified that when Hussein Ahmed sold the fresh khat at the Somali House of Coffee, that people would learn that it was there and they would come to the shop to buy it. Ahmed stored the khat he sold at the shop in an unlocked back room of the building, but he testified that he did not

have keys to the shop. These facts clearly provide the existence of an agreement that was mutually beneficial to each. Ahmed testified that he continued to sell dry khat with Mire's knowledge and permission at the coffee shop until March 2010, and he continued to sell fresh khat with the knowledge and permission at the coffee shop until April or May 2010. These time frames are within the relevant time period. At the very least, the elements of a conspiracy involving Husein Ahmed and Jama Mire existed until May of 2010.

As to Defendant Liban Abdirahman, Hashim Ahmed, another cab driver, testified that he once asked Abdirahman whether he had any khat. Abdirahman told Ahmed that he did not have any, but that he delivered khat to Ohio for Yusuf Mohamed. The Government also produced translated transcripts of several telephone calls Abdirahman made or received wherein Abdirahman discusses buying, selling, and transporting khat with Yusuf Mohamed. Handule Mohamed testified that Abdirahman wired money via wire transfer service Dahabshiil, Inc. on November 24, 2009, to Yasin Abdulahi, a known khat supplier. This evidence is sufficient to show an agreement with other persons to distribute and possess with intent to distribute cathinone.

**D. Crime of Possession of a Mixture Containing a Detectable Amount of Cathinone**

Finally, Defendant Mire asserts that count three – possession with intent to distribute a mixture of a detectable amount of cathinine – is not a crime under the CSA. According to Mire, the Court should adopt a "usable quantity rule," which would mean that "the government could not obtain a conviction in a [khat] case, especially where minute amounts of contraband were involved, unless it proved that the quantity of [khat containing cathinone] possessed represented a quantity capable of use or abuse (i.e., that it was enough to produce the proscribed physiological effect)." *United States v. Jeffers*, 524 F.2d 253, 256 (7th Cir. 1975). However, the

Seventh Circuit has held that the doctrine is "neither applicable nor appropriate" for use in connection with 21 U.S.C. § 844(a), and its reasoning applies with equal force here. *Id.* at 258.

Mire argues that one goal of controlled substances legislation is to curb societal drug abuse and punishing the possession of minute quantities of drugs arguably does little to further this goal. While this may be true, there is no indication that Congress sought to limit the extent of the statute to usable quantities. *Id.* at 257. The agency rule including cathinone in Schedule I includes "any material compound, mixture, or preparation which contains *any quantity* of the following substances having a stimulant effect on the central nervous system." 21 C.F.R. 1308.11(f) (emphasis added). In addition, 21 U.S.C. § 841(a)(1) prohibits knowing or intentional possession of a controlled substance with intent to manufacture, distribute, or dispense. "Clearly, a person possesses a controlled substance whether it be a trace or a pound." *Jeffers*, 524 F.2d at 257. As a result, this argument is unavailing.

In addition, Mire asserts that the usable quantity doctrine is based on the fact that "knowledge and intent to possess a substance cannot be inferred from possession of mere traces of the substance." *Id.* at 257. To the extent that the CSA avoids running afoul of due process because it includes a scienter requirement, the fact that the usable quantity rule derives in part from concerns about proving state of mind is especially pertinent. However, this concern 'can be dealt with under federal law without resorting to the 'usable quantity' doctrine." *Id.* For example, "an adequate instruction on what inferences with regard to a defendant's knowing possession can be drawn from the fact of physical possession of a controlled substance in such circumstances solves the problem without reference to the 'usable quantity' doctrine." *Id.*

Finally, in rejecting the usable quantity doctrine, the Seventh Circuit adopted the "measurable quantity" doctrine as a bright-line, objective test for narcotics cases. *Id.* at 258. The

Court finds that, for the reasons explained above, the measurable quantity test is equally applicable to khat-containing-cathinone cases. The government must prove beyond a reasonable doubt that Mire possessed with intent to distribute only a measurable amount of cathinone.

### E. Due Process Regarding Quantity

Rafle and Abdirahman also challenge the conspiracy charge against them on the basis of due process. Convicting a person for the possession or distribution of a substance regardless of the quantity of the substance possessed when that substance is regulated because of its stimulating effects on the human neurological system, so the argument goes, is fundamentally unfair.

This argument is a nonstarter. Rafle and Abdirahman are charged with *conspiracy* to possess and distribute cathinone, not mere possession with intent to distribute cathinone. Conviction for conspiracy does not require proof that either Defendant ever possessed cathinone, and the government could succeed in its proof without introducing any cathinone (or khat containing cathinone) whatsoever. *See United States v. Shabani*, 513 U.S. 10, 15-16 (1994) (holding that the *actus reus* of a conspiracy in violation of 21 U.S.C. § 846 is the agreement itself and the Government need not prove the commission of any overt acts in furtherance of the conspiracy). It is thus unclear to the Court what the Defendants could gain from the Court's musing as to the fairness of a law school exam hypothetical: conviction for possession based on seized khat that was not tested to determine the amount of cathinone in its leaves. The government must merely show that the each Defendant knew that khat contained a controlled substance, as discussed above, and this could certainly be accomplished without introducing and testing khat that the government seized from Rafle, Abdirahman, or any other co-defendant.

## F. Equal Protection

While the Government is more often accused of "throwing the book" at a defendant, in this case it appears that it is the defendant who has sent a treatise airborne. Abdirahman asserts that conviction under the CSA for any khat-containing-cathinone offense violates his right to Equal Protection under the Fifth Amendment because khat users are almost exclusively of Somali, Ethiopian, Yemeni, or Eritrean descent. *See Caseer*, 399 F.3d at 853-53 ("It does not seem likely that khat use will expand beyond the ethnic Somalian, Ethiopian, Yemeni, and Eritrea communities. According to the DEA, there is no indication that khat is marketed outside these ethnic communities, even though it appears to be readily available.") (citing U.S. Drug Enforcement Administration, *Drug Intelligence Brief, Khat, June 2002.* http://www.justice.gov/ndic/pubs3/3920/index.htm (accessed April 3, 2012). Abdirahman asserts that, as applied, the CSA singles out certain individuals for prosecution on the basis of their race or their national origin. As if that weren't enough, Abdirahman also asserts that the CSA as applied to him violates his rights to freedom of speech, freedom of association, and something he terms the "right to freedom of privacy." These arguments apparently stem from the evidence that the Government presented in its case-in-chief: wiretapped cellular telephone conversations and circumstantial evidence about the conspiracy in which some of his associates participated. For the reasons discussed below, Abdirahman's contentions are without merit.

While the Fourteenth Amendment Equal Protection Clause applies to state action, the Fifth Amendment also contains an equal protection component that applies to federal government action. *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 542 n.21 (1987). The approach to Fifth Amendment equal protection claims is the same as the approach to Fourteenth Amendment claims. *United States v. Nagel,* 559 F.3d 756,

760 (7th Cir. 2009) (quoting *San Francisco Arts*, 483 U.S. at 542 n.21). Regardless of the applicable amendment, "[e]qual protection of the laws means that all persons similarly situated should be treated alike." *Nagel*, 559 F.3d at 760. Because the level of scrutiny by which the Court will evaluate the CSA depends on whether a fundamental right or suspect classification is at issue, the Court will first analyze whether the CSA implicates any fundamental rights.

Abdirahman, of course, argues that the CSA as applied violates his rights to freedom of speech, freedom of association, and his right to privacy. It bears mentioning at the outset that even these fundamental rights are not absolute, and in certain circumstances, the government is free to limit them. *E.g.*, *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010).

At trial, the government introduced transcripts of wiretapped cellular telephone calls between Abdirahman and other co-defendants in these two cause numbers as evidence that Abdirahman knowingly conspired with his co-defendants to distribute, and possess with intent to distribute, khat containing cathinone. The *actus reus* of a conspiracy in violation of 21 U.S.C. § 846 is the agreement itself, *Shabani*, 513 U.S. at 15-16, and although this agreement may often be proved by speech, "Congress, by making the act of conspiracy to distribute controlled substances unlawful, has neither criminalized private thoughts nor invaded the sphere protected by the First Amendment." *United States v. Pulido*, 69 F.3d 192, 209 (7th Cir. 1995) (citing *Shabani*, 513 U.S. at 15-17); *see also White*, 610 F.3d at 960 ("Speech integral to criminal conduct, such as fighting words, threats, and solicitations, remain categorically outside [First Amendment] protection."). If Abdirahman's speech relates to his agreement to participate in the conspiracy, then his speech is not protected, and his right to freedom of speech is not violated. On the other hand, if the words spoken by Abdirahman do not relate to the conspiracy, then his speech may very well be protected, but at the same time his right to freedom of speech is not

violated because his conviction may not legally rest on the words he spoke during these wiretapped telephone calls. In short, there is no way that a conviction under the CSA for khat containing cathinone will burden Abdirahman's right to freedom of speech.

The same can be said of Abdirahman's right to freedom of association: "[criminal conspiracy statutes] have not been held to be per se unlawful because they violate the right of freedom of association." *United States v. Wilson*, 154 F.3d 658, 666 (7th Cir. 1998). It may be that Abdirahman is concerned that he will be found guilty by association with others who have admitted to the conspiracy, but the elements of proof for a conspiracy charge protect against this result. The Government must prove, and the trier of fact must find, that Abdirahman himself knowingly agreed to participate in the conspiracy with intent to further the conspiracy in order to return a verdict of guilt as to this charge. *Id.* (discussing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982), in which "the Supreme Court refused to impose liability on individual members of the NAACP without clear proof of a specific intent to further an unlawful aim embraced by that group, concluding that individuals with no intent to violate the law cannot be held liable for the illegal acts of others.")

Finally, conviction under the CSA for a conspiracy related to khat containing cathinone does not violate Abdirahman's right to privacy. Abdirahman argues that a person who possesses khat and does not know that it contains cathinone, or the khat in fact has no controlled substance in it, "has the right to do whatever [he] wants with that substance. That is part of the American way." This argument runs far afield of the facts at hand. It bears repeating that conviction for the charged crime – conspiracy – requires knowledge that khat contains cathinone. In addition, the charge of conspiracy has nothing to do with what the defendant actually *did* with khat; as the Court has said again and again, agreement is the actus reus of the conspiracy, and no more is

needed. The "American way," whatever that means, is not implicated.

What remains of Abdirahman's Equal Protection claim, then, is the assertion that application of the CSA falls disproportionately on certain racial or national minorities. There can be no question that the CSA is facially neutral, thus Abdirahman's challenge is to its disparate impact. "Even if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). Abdirahman has not pointed to any evidence from which the Court could conclude that Congress had discriminatory intent when it included cathinone in the controlled substances schedules.

If no discriminatory intent has been shown and no fundamental right is involved, the Court subjects the challenged statute to rational basis review. *See United States v. Jester*, 139 F.3d 1168, 1171 (7th Cir. 1998); *United States v. Chandler*, 996 F.2d 917, 918 (7th Cir. 1993). Under rational basis review, the challenger can only prevail by showing that the disputed classification bears no reasonable relation to any proper legislative purpose. *United States v. Moore*, 644 F.3d 553, 555-56 (7th Cir. 2011).

Cathinone was added by agency rule as a Scheduled I controlled substance in 1993 pursuant to the Attorney General's power to add and remove substances from the schedules. Schedules of Controlled Substances: Placement of Cathinone and 2,5-Dimethoxy-4-ethylamphetamine into Schedule I, 58 Fed. Reg. 4,316-02 (Jan. 14, 1993); 21 U.S.C. § 811(a). When cathinone was added, the Administrator of the DEA found that cathinone had a high potential for abuse, was not currently accepted for use in medical treatment in the United States, and there was a lack of accepted safety for use of cathinone under medical supervision. *Id.* at 4,317. Including cathinone in the controlled substance schedules is rationally related to the

legitimate legislative purpose of protecting the public from the dangers of cathinone identified by the DEA. The cathinone scheme thus survives rational-basis review.

### G. "Cultural Defense" Pursuant to the International Convention on Civil and Political Rights

Finally, Abdirahman argues that a conviction for conspiracy to possess with intent to distribute and to distribute cathinone would violate his "right to enjoy cultural life," secured to him by Article 27 of the International Convention on Civil and Political Rights (the "ICCPR"), which the United States ratified in 1992. United States: Senate Committee on Foreign Relations Report on the International Covenant on Civil and Political Rights, 31 I.L.M. 645 (1992). Article 27 provides "In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their own language." According to the Defendant, the right to enjoy his own culture amounts to what he has termed a "cultural defense."

There are problems with this argument at the outset. The ICCPR was ratified by the Senate with the express reservation that Articles 1 through 27 be non-self-executing. Senate Committee on Foreign Relations Report, 31 I.L.M. at 657. As a non-self-executing treaty, the ICCPR"[does] not itself create obligations enforceable in the federal courts.[2] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004). Therefore, the ICCPR does not provide Abdirahman with a

---

[2] The Senate declaration "clarif[ies] that the Covenant will not create a private cause of action in U.S. courts." Senate Committee on Foreign Relations Report, 31 I.L.M. at 657. Abdirahman does not assert his rights under the ICCPR as a sword, however, instead wielding his rights as a shield to block attack by the Government. While an argument can be made for differentiating the two, David Sloss, *The Domestication of International Human Rights: Non-Self-Executing Declarations and Human Rights Treaties*, 24 Yale J. Int'l L. 129, 210-14 (1999); the Court does not find this argument persuasive.

defense to this criminal proceeding.[3]

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Defendants' Rule 29(a) motions in their entirety.

SO ORDERED: 04/23/2012

*[signature: William T. Lawrence]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[3] Abdirahman's use of the cultural defense as an absolute defense is also novel, as it more commonly appears relative to the state of mind element in a criminal case. *E.g.*, Megan H. Dearth, *Defending the "Indefensible": Replacing Ethnocentrism with a Native American Cultural Defense*, 35 Am. Indian L. Rev. 621, 624-30 (2011). Even if there exists an application of the concept as an absolute defense, rather than as a factor to consider regarding state of mind, it proves too much. There would seem to be no limit to the crimes that could be excused by reference to one's culture. It seems unlikely that even the ICCPR envisions a right that could circumvent the entirety of the criminal law.